**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| DR. TIA ROBINSON-COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| IVY TECH SOUTH BEND-ELKHART, | ) | Case No. 1:25-cv-01448-JRO-MJD |
| IVY TECH COMMUNITY COLLEGE | ) | |
| OF INDIANA, and SUE ELLSPERMANN, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iv
STATEMENT OF ISSUES ........ vi
I. INTRODUCTION ........ 1
II. STATEMENT OF MATERIAL FACTS IN DISPUTE ........ 2
a. Defendant hired Dr. Robinson-Cooper to turn around a struggling campus and performed her job well. ........ 2
b. Defendant's leaders answered to the same President. ........ 4
c. Defendant's progressive discipline policy. ........ 4
d. Defendant's EthicsPoint system and HR investigation procedure. ........ 4
e. Defendant coached Dr. Robinson-Cooper on complaints it never discussed with her. ........ 5
f. Defendant issued Dr. Robinson-Cooper an Evaluation. ........ 6
g. Defendant issues Dr. Robinson-Cooper a Last Chance Agreement. ........ 7
h. Ellspermann discouraged Dr. Robinson-Cooper from taking leave for knee surgery ........ 9
i. Defendant fired Dr. Robinson-Cooper two days before her surgery. ........ 9
j. Ellspermann responded to misconduct by white male leaders with leniency. ........ 10

a. Former South Bend Chancellor David Balkin ....10

b. Richmond Chancellor Chad Bolser ....11

c. Sellersburg Chancellor Travis Haire ....13

d. Foundation President John Murphy ....15

e. Muncie Chancellor Jeff Scott ....16

III. PLAINTIFF'S OBJECTIONS TO DEFENDANT'S MATERIAL FACTS IN DISPUTE ....17

IV. SUMMARY JUDGMENT STANDARD ....19

V. LEGAL STANDARD FOR RACE AND SEX DISCRIMINATION ....19

VI. A reasonable jury could find that Dr. Robinson-Cooper's race and sex motivated her termination. ....20

a. Dr. Robinson-Cooper is a member of a protected class and suffered an adverse action. ....20

b. Whether Dr. Robinson-Cooper was meeting Defendant's legitimate expectations merges with pretext. ....20

c. Defendant treated similarly situated white male leaders more favorably. ....21

i. Haire's misconduct was more serious than anything attributed to Dr. Robinson-Cooper. ....22

ii. Balkin led the same campus worse and was never disciplined. ....23

iii. Murphy used a homophobic slur, falsified engagement scores, and was given a paid exit. ....24

iv. Bolser faced complaints of an inappropriate relationship, yet he kept his job. ....26

v. Scott put the college's federal funding at risk for years and received a PIP and an "Exceeds" rating. ....26

d. Dr. Robinson-Cooper independently satisfies the fourth element because Defendant replaced her with a white man. ....28

e. Defendant's stated reason is pretextual. ....28

i. Ivy Tech's reasons for the last chance agreement keep shifting. ....29

ii. Ivy Tech's reasons for the termination keep changing. ....29

f. Dr. Robinson-Cooper has presented specific evidence to rebut Defendant's honest belief. ....30

VII. A reasonable jury could find that Defendant interfered with Dr. Robinson-Cooper's FMLA rights. ....31

a. Dr. Robinson-Cooper gave sufficient notice. ....32

b. Defendant interfered with Dr. Robinson-Cooper's FMLA rights. ....33

c. Dr. Robinson-Cooper was prejudiced. ..... 34

VIII. A reasonable jury could find that Defendant retaliated against Dr. Robinson-Cooper for seeking FMLA leave. ..... 34

a. Dr. Robinson-Cooper engaged in protected activity and suffered an adverse action ..... 35

b. A reasonable jury could find that her request for leave caused her termination. ..... 35

i. There is suspicious timing between Dr. Robinson-Cooper informing Ellspermann of her surgery and her LCA and termination. ..... 35

ii. Other bits and pieces. ..... 36

CONCLUSION ..... 36

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............ 19, 27, 33, 37

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573 (7th Cir. 2003) ............ 29

*Burton v. Will Cnty. Sheriff's Merit Comm'n*, 176 F.4th 544 (7th Cir. 2026) ............ 20

*Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996) ............ 28

*Casna v. City of Loves Park*, 574 F.3d 420 (7th Cir. 2009) ............ 35

*Castleman v. Acme Boot Co.*, 959 F.2d 1417 (7th Cir. 1992) ............ 29

*Chitwood v. Ascension Health All.*, 168 F.4th 493 (7th Cir. 2026) ............ 34

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ............ *passim*

*Collier v. Budd Co.*, 66 F.3d 886 (7th Cir. 1995) ............ 31

*Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005) ............ 35

*Curry v. Menard, Inc.*, 270 F.3d 473 (7th Cir. 2001) ............ 21

*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994) ............ 31, 35

*Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827 (7th Cir. 2007) ............ 21

*Flores v. Preferred Tech. Grp.*, 182 F.3d 512 (7th Cir. 1999) ............ 30

*Goelzer v. Sheboygan Cnty.*, 604 F.3d 987 (7th Cir. 2010) ............ 31, 34

*Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) ............ 23, 28, 31

*Harper v. C.R. England, Inc.*, 687 F.3d 297 (7th Cir. 2012) ............ 35

*Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008) ............ 35

*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013) ............ 27, 30

*Johnson v. Nordstrom, Inc.*, 260 F.3d 727 (7th Cir. 2001) ............ 28

*Knight v. City of Carmel*, No. 1:22-cv-02150-JRS-MKK, 2024 WL 2800210 (S.D. Ind. May 3, 2024) ............ 19

*Lawson v. CSX Transp., Inc.*, 245 F.3d 916 (7th Cir. 2001) ............ 29

*Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484 (8th Cir. 1998) ............ 22

*McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789 (7th Cir. 1997) ............ 35

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ............ 20

*Otero v. Ind. Harbor Belt R.R. Co.*, 664 F. Supp. 3d 860 (N.D. Ind. 2023) ............ 33

*Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840 (7th Cir. 2007) ............ 28

*Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681 (7th Cir. 2007) ....................21

*Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir. 1996) ....................36

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ....................20, 31

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712 (7th Cir. 2005) ....................30

*Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022) ....................19

*Srail v. Vill. of Lisle*, 588 F.3d 940 (7th Cir. 2009) ....................27

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ....................20, 28

*Tolan v. Cotton*, 572 U.S. 650 (2014) (per curiam) ....................19

*Ziccarelli v. Dart*, 35 F.4th 1079 (7th Cir. 2022) ....................32, 33, 34

**Statutes**

29 U.S.C. § 2611(2)(A) ....................32

29 U.S.C. § 2611(4)(A)(iii) ....................32

29 U.S.C. § 2612(a)(1)(D) ....................32

29 U.S.C. § 2614(c)(1) ....................34

29 U.S.C. § 2615(a)(1) ....................33

**Regulations**

29 C.F.R. § 825.220(b) ....................33

29 C.F.R. § 825.300(b)(1) ....................32

29 C.F.R. § 825.302(c) ....................32

**Rules**

Fed. R. Civ. P. 56(a) ....................19

## STATEMENT OF ISSUES

1. Whether a reasonable jury could find that Defendants terminated Dr. Robinson-Cooper because of her race and sex, in violation of Title VII and the Equal Protection Clause, where the same President who disciplined and fired her for complaints that were never investigated with her imposed lesser discipline, or none, on five white male leaders who engaged in more serious misconduct; where Ivy Tech's reasons for the last chance agreement and the termination have shifted; and where Ivy Tech replaced her with a white man.

2. Whether a reasonable jury could find that Defendant interfered with Dr. Robinson-Cooper's rights under the Family and Medical Leave Act when, after she gave notice that she needed leave for scheduled knee surgery, the President told her she did not need FMLA leave and Defendant fired her two days before the surgery.

3. Whether a reasonable jury could find that Defendant retaliated against Dr. Robinson-Cooper for giving notice of her need for FMLA leave, based on the timing of her needs-improvement rating, last chance agreement, and termination after that notice and on the President's statements discouraging the leave.

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **DR. TIA ROBINSON-COOPER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:25-cv-01448-JRO-MJD** |
| | ) | |
| **IVY TECH SOUTH BEND-ELKHART,** | ) | |
| **IVY TECH COMMUNITY COLLEGE** | ) | |
| **OF INDIANA, and SUE ELLSPERMANN,** | ) | |
| **in her individual capacity,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Dr. Tia Robinson-Cooper ("Dr. Robinson-Cooper"), by counsel, submits her brief in opposition to the Defendants' Motion for Summary Judgment. Dr. Robinson-Cooper presents sufficient evidence that she was terminated because of her race and sex in violation of Title VII and the Equal Protection Clause, and that Defendant interfered with and retaliated against her exercise of rights under the Family and Medical Leave Act. Based on the following evidence of Defendants' unlawful conduct, summary judgment must be denied.

## I. INTRODUCTION

Ivy Tech's own witnesses describe the rules it applies to its chancellors: every complaint is investigated, the accused is heard before any decision, no one is disciplined on an unsubstantiated complaint, and the same misconduct results in the same accountability regardless of which chancellor committed it. Dr. Tia Robinson-Cooper, a Black woman, asks that those rules be applied to her as they were applied to the white men who led Ivy Tech's other campuses.

They were not. Ellspermann hired Dr. Robinson-Cooper to repair a campus that its white male chancellor had left in deficit and disarray, and Dr. Robinson-Cooper balanced its budget and improved its enrollment and retention. However, within four months of her first documented

coaching, Defendant placed her on a last-chance agreement and fired her, on uninvestigated complaints. Defendant's explanation for the termination has changed over time. However, Ellspermann responded to documented misconduct by white male leaders, including buying alcohol for a minor, use of a homophobic slur and repeated complaints of aggressive behavior, with informal coaching, warnings, and improvement plans. Ellspermann discouraged Dr. Robinson-Cooper from taking FMLA leave, then fired her two days before her scheduled surgery. A reasonable jury could find for Dr. Robinson-Cooper on each claim, and Defendants' motion should be denied.

## II. STATEMENT OF MATERIAL FACTS IN DISPUTE

### a. Defendant hired Dr. Robinson-Cooper to turn around a struggling campus and performed her job well.

Dr. Robinson-Cooper is a Black woman. (Dkt. 102-8 at 19.) Defendant hired her as Chancellor of its South Bend–Elkhart campus, and she began work on July 11, 2022. (Dkt. 102-8 at 4.) She reported directly to President Sue Ellspermann ("Ellspermann"). (Dkt. 102-7 at 58 (Ellspermann Dep. at 228:10–11).)

The campus Dr. Robinson-Cooper inherited was struggling in enrollment, retention, and finances. (Dkt. 102-7 at 58 (Ellspermann Dep. at 228:12–19).) It carried a budget deficit of $2 to $3 million. (Dkt. 102-1 at 226 (Robinson-Cooper Dep. at 225:19–23).) When Ellspermann offered Dr. Robinson-Cooper the job, she said the former leader had left the campus "in disarray" and that she needed Dr. Robinson-Cooper to "right the ship." (Dkt. 102-1 at 229 (Robinson-Cooper Dep. at 228:19–25).) Ellspermann described a toxic culture, low morale, damaged community relationships, low enrollment and retention, and a deep deficit. (Dkt. 102-1 at 230 (Robinson-Cooper Dep. at 229:1–21).) She said the prior chancellor, David Balkin ("Balkin"), "led very aggressively" and that "people feared him." (Dkt. 102-1 at 228 (Robinson-Cooper Dep. at 227:19–25).)

Under Dr. Robinson-Cooper's leadership, those areas improved. (Dkt. 102-7 at 58 (Ellspermann Dep. at 228:19–20).) She balanced the budget, eliminated the deficit, and built the campus's reserves to roughly 235 days. (Dkt. 102-1 at 227 (Robinson-Cooper Dep. at 226:1–5).) In a presentation to the board, Chase recognized her for eliminating an eight-year budget deficit. (Dkt. 102-1 at 227 (Robinson-Cooper Dep. at 226:9–14).) Fellow chancellor Dr. Mia Johnson testified that Dr. Robinson-Cooper's performance was good, "had gotten to a pretty bad state under the previous leadership," but Dr. Robinson-Cooper "was turning that campus around" and its numbers were moving in a positive direction. (Dkt. 102-2 at 19 (Johnson Dep. at 67:17–22).) Johnson based that view on the statewide enrollment and retention data available to all chancellors. (Dkt. 102-2 at 19 (Johnson Dep. at 68:1–4).)

Ellspermann rated Dr. Robinson-Cooper "Exceeds Expectations" on her December 2022 evaluation. (Dkt. 102-20 at 2 (Robinson-Cooper Aff. ¶ 6).) In May 2023, she led the campus's annual impact gala, which raised about $330,000, and Ellspermann agreed it was a successful fundraising outcome. (Dkt. 102-7 at 59 (Ellspermann Dep. at 233:15–22).) The community received her well overall. (Dkt. 102-7 at 60 (Ellspermann Dep. at 234:11–12).) On January 23, 2024, Ellspermann acknowledged that Dr. Robinson-Cooper met all of her WIG's with the exception of online retention. (Dkt. 102-17 at 1; Dkt. 102-20 at 4 (Robinson-Cooper Aff. ¶¶ 26–28).) Chase, McNichols, Hawkins, and Ellspermann never witnessed Dr. Robinson-Cooper be rude or disrespectful to anyone and found her to always be open to feedback. (Dkt. 102-4 at 40 (Chase Dep. at 159:4–16, 160:8–11); Dkt. 102-3 at 18 (Hawkins Dep. at 65:8–9); Dkt. 102-5 at 39 (McNichols Dep. at 150:9–12)) Before November 3, 2023, Dr. Robinson-Cooper had never received any coaching for Ellsperman, Chase, McNichols, or Hawkins. (Dkt. 102-20 at 3 (Robinson-Cooper Aff. ¶ 14).)

Before November 3, 2023, Dr. Robinson-Cooper had never received coaching from anyone at Ivy Tech. (Dkt. 102-20 at 3 (Robinson-Cooper Aff. ¶¶ 15–16).)

**b. Defendant's leaders answered to the same President.**

As President, Ellspermann oversaw her cabinet and all nineteen campus chancellors. (Dkt. 102-4 at 8–9 (Chase Dep. at 32:15–33:12).) Her cabinet included Dom Chase ("Chase"), the Senior Vice President for Business Affairs and Chief Financial Officer, who oversaw human resources. (Dkt. 102-4 at 4 (Chase Dep. at 13:1–19).) It also included Matt Hawkins ("Hawkins"), the Executive Vice President and Chief of Staff. (Dkt. 102-3 at 5 (Hawkins Dep. at 11:7–11).) Mike McNichols ("McNichols"), the Vice President for Human Resources, reported to Chase. (Dkt. 102-5 at 4 (McNichols Dep. at 11:4–12:3).)

Every termination at Defendant, for any position, ran through Ellspermann, even terminations of janitors. (Dkt. 102-3 at 11 (Hawkins Dep. at 36:13–18, 37:7–19).)

**c. Defendant's progressive discipline policy.**

Defendant has a progressive discipline policy. (Dkt. 102-7 at 16 (Ellspermann Dep. at 58:7–9).) Discipline moves from informal coaching to documented coaching to a last chance agreement. (Dkt. 102-3 at 12 (Hawkins Dep. at 40:5–11).) Immediate termination is reserved for egregious conduct, such as threatening violence, a sexual relationship with a subordinate, endangering student safety, illegal activity, or misusing funds. (Dkt. 102-7 at 19–20 (Ellspermann Dep. at 73:24–74:21).) The same misconduct should result in the same accountability, regardless of which chancellor commits it. (Dkt. 102-7 at 13 (Ellspermann Dep. at 48:19–49:1).)

**d. Defendant's EthicsPoint system and HR investigation procedure.**

EthicsPoint is Defendant's anonymous system for reporting unethical or inappropriate behavior. (Dkt. 102-5 at 10–11 (McNichols Dep. at 37:4–38:2).) Defendant's policy was that every EthicsPoint complaint be investigated. (Dkt. 102-7 at 20 (Ellspermann Dep. at 75:21–23).) When a complaint involved a chancellor, McNichols led the investigation. (Dkt. 102-5 at 12

(McNichols Dep. at 42:10–13).)

HR investigates to determine whether the allegation is true. (Dkt. 102-5 at 14 (McNichols Dep. at 51:24–52:4).) HR investigations include speaking to all parties directly involved. (Dkt. 102-7 at 23 (Ellspermann Dep. at 86:15–19).) When the facts suggest the subject of a complaint did something wrong, HR gives that person a chance to respond. (Dkt. 102-5 at 15 (McNichols Dep. at 57:6–12).) Defendant does not discipline an employee for an unsubstantiated complaint. (Dkt. 102-5 at 16 (McNichols Dep. at 59:10–12).)

When an HR or EthicsPoint complaint led to discipline, Ellspermann was the ultimate decisionmaker. (Dkt. 102-3 at 15 (Hawkins Dep. at 52:4–16).)

**e. Defendant coached Dr. Robinson-Cooper on complaints it never discussed with her.**

On November 3, 2023, Ellspermann issued Dr. Robinson-Cooper a documented coaching resting on four matters. (Dkt. 102-7 at 61–62, 66 (Ellspermann Dep. at 240:25–241:5, 244:13–245:3, 258:15–17).) First, an EthicsPoint complaint about an interaction with students and staff, which Ellspermann, though she did not witness it, described as "loud and forceful." (Dkt. 102-7 at 63 (Ellspermann Dep. at 247:17–248:9).) Second, an interaction with Carey Treager, who described Dr. Robinson-Cooper as being pissed at her. (Dkt. 102-7 at 64 (Ellspermann Dep. at 251:10–19).) Third, an email to a Emily Sellers ("Sellers") employee that Ellspermann considered "brash" because it called the template a "moving target" and said she wished it "would stop changing." (Dkt. 102-7 at 65 (Ellspermann Dep. at 255:10–256:7).) Fourth, her tone with system office leaders Molly Dodge and Dean McCurdy. (Dkt. 102-7 at 66 (Ellspermann Dep. at 258:15–17).)

No one asked Dr. Robinson-Cooper about the EthicsPoint complaint, the alleged Treager conversation, or her email to Sellers before issuing the documented coaching. (Dkt. 102-1 at

312–314 (Robinson-Cooper Dep. at 311:9–23, 312:1–7, 313:5–18).) Ellspermann testified that she would have withdrawn or changed the coaching Dr. Robinson-Cooper refuted the complaints. (Dkt. 102-7 at 65 (Ellspermann Dep. at 256:15–257:2).) But when Ellspermann delivered it, Dr. Robinson-Cooper told her the incidents "never happened" and asked to understand them; Ellspermann refused to discuss them, saying they had been "investigated thoroughly" and she was "standing on" her vice presidents' findings. (Dkt. 102-1 at 138–139 (Robinson-Cooper Dep. at 137:19–138:21).) As for Dodge and McCurdy, Ellspermann had told Dr. Robinson-Cooper she had no concerns and replied "Great" when Dr. Robinson-Cooper reported meeting with them. (Dkt. 102-1 at 315–316, 318 (Robinson-Cooper Dep. at 314:12–315:10, 317:11–15).)

**f. Defendant issued Dr. Robinson-Cooper an Evaluation.**

In January 2024, Ellspermann rated Dr. Robinson-Cooper "needs improvement." (Dkt. 102-7 at 66 (Ellspermann Dep. at 258:20–259:6).) Dr. Robinson-Cooper was evaluated over nine (9) competencies. (Dkt. 102-16 at 2–9) Dr. Robinson-Cooper received a meets or exceeds expectations on the following competencies: Diversity, Equity and Inclusion, Fundraising, Use of Data, Crisis Management, External Partnerships and Public Relations and Culture of Student Success. (Dkt. 102-16 at 2, 4–5, 8–9) She received a "Needs Improvement" rating in the following competencies: Change Management, Team Building, and Communication. (Dkt. 102-16 at 3–5)

Ellspermann, rated Dr. Robinson-Cooper "needs improvement" for the Change Management Competency because she believed that Dr. Robinson-Cooper had not created buy-in from staff and stated that was evident for the lack of 4DX adoption. (Dkt. 102-16 at 3) However, on January 23, 2024, Ellspermann stated that Dr. Robinson-Cooper's 4DX rollout went well, that there was currently no expectation for the adoption 4DX, that Dr. Robinson-

Cooper's 4DX dashboard was already looking better and that as Suzanne (the 4DX Implementer) stated that it was still early for new campuses to be formally using the dashboard. (Dkt. 102-17 at 1; Dkt. 102-20 at 4 (Robinson-Cooper Aff. ¶¶ 26–27).)

Before Dr. Robinson-Cooper received the evaluation, Ellspermann never told her that she had any issues with team building, with creating a positive team environment that engages and empowers employees, or with creating an environment of collaboration and shared problem solving, and never discussed Gallup engagement scores with her. (Dkt. 102-20 at 3 (Robinson-Cooper Aff. ¶¶ 21–24).)

**g. Defendant issues Dr. Robinson-Cooper a Last Chance Agreement.**

On February 13, 2024, Ellspermann issued Dr. Robinson-Cooper a LCA. (Dkt. 102-19 at 1–6) The LCA states that Ellspermann issued Dr. Robinson-Cooper the LCA because of her job performance and behavior and identified the following areas of concerns:

A December 7, 2023 EthicsPoint alleged that Dr. Robinson-Cooper, while referring to Chancellor Stacy Atkinson, put her hands over her ears and said she did not know how anyone could stand working with Atkinson and her loud voice. (Dkt. 102-19 at 1–2.) When McNichols spoke with Dr. Robinson-Cooper about the EthicsPoint, he told her only that it concerned pictures taken at the dinner and contact with the former Indianapolis chancellor. He did not tell her about any allegation that someone called Atkinson loud or covered their ears. (Dkt. 102-1 at 322–323 (Robinson-Cooper Dep. at 321:25–322:19).) Chancellor Sikoski did not recall Dr. Robinson-Cooper making the alleged comment. (Dkt. 81-22 at 1.) Chancellor Haire said Dr. Robinson-Cooper mentioned that Atkinson was loud that evening but that the comment was not made in a negative way. (*Id.*)

On January 30, 2024, Ivy Tech received an EthicsPoint complaint about a prayer given at

the South Bend-Elkhart Campus Board of Trustees holiday dinner on December 19, 2023. (Dkt. 81-52 at 1; Dkt. 102-19 at 2.) McNichols discussed the EthicsPoint with Dr. Robinson-Cooper and she informed him that the foundation asked Michael Patton, a community member, to pray at the dinner. (Dkt. 102-1 at 260 (Robinson-Cooper Dep. at 259:4–13).) McNichols never told Dr. Robinson-Cooper that she could not discuss the EthicPoint with anyone. (Dkt. 102-20 at 4 (Robinson-Cooper Aff. ¶ 29).)

On February 7, 2024, Ivy Tech received an EthicsPoint alleging that Dr. Robinson-Cooper told people at a dinner that she was in trouble for praying at a staff event. (Dkt. 81-27 at 1.) Dr. Robinson-Cooper told McNichols the allegations were untrue. She said she did not discuss the January 30 complaint at the table, she stated she spoke with Chancellor Huskey away from the table, by the doors, for less than five minutes, to get his advice on handling future events and discuss it with her colleagues. (Dkt. 81-28 at 1; Dkt. 102-1 at 163, 166 (Robinson-Cooper Dep. at 162:14–22, 165:9–11).)

The Last Chance Agreement asserts that the February 7 investigation revealed that multiple members of Dr. Robinson-Cooper's cabinet had been told about the January 30 complaint. (Dkt. 102-19 at 2.) However, McNichols's notes of his February 12, 2024 interview with Dr. Robinson-Cooper do not mention any cabinet members. (Dkt. 81-28 at 1.)

The Last Chance Agreement also states that faculty and staff had expressed concerns that a suitable level of trust and psychological safety had not been established under Dr. Robinson-Cooper's leadership. (Dkt. 102-19 at 2.) No one ever asked Dr. Robinson-Cooper about any complaint regarding trust or psychological safety. (Dkt. 102-20 at 5 (Robinson-Cooper Aff. ¶ 31).)

**h. Ellspermann discouraged Dr. Robinson-Cooper from taking leave for knee surgery.**

In January 2023, Dr. Robinson-Cooper told Ellspermann she needed knee surgery and would need to be off work for three months. (Dkt. 102-8 at 4.) Ellspermann responded that her own mother, in her eighties, had her knee done and was walking in two days, and told her told her that she did not need time off and could keep working. (Dkt. 102-1 at 117, 119 (Robinson-Cooper Dep. at 116:9–13, 118:10–20).) Discouraged, Dr. Robinson-Cooper postponed the surgery and began physical therapy. (Dkt. 102-1 at 117 (Robinson-Cooper Dep. at 116:2–13).)

In January 2024, Dr. Robinson-Cooper told Ellspermann that her surgery was scheduled and that she would need leave. (Dkt. 102-1 at 308–309 (Robinson-Cooper Dep. at 307:18–308:1).) Ellspermann told her she did not need FMLA leave because it was only knee surgery, and that she could keep working and attend meetings with her camera off. (Dkt. 102-1 at 309 (Robinson-Cooper Dep. at 308:17–24).) Ellspermann's comments made clear that she did not believe Dr. Robinson-Cooper needed to be off, so Dr. Robinson-Cooper did not request leave. (Dkt. 102-1 at 309–310 (Robinson-Cooper Dep. at 308:25–309:5).) Her surgery was scheduled for March 8, 2024. (Dkt. 102-1 at 293 (Robinson-Cooper Dep. at 292:1–11).)

**i. Defendant fired Dr. Robinson-Cooper two days before her surgery.**

On March 5, 2024, Ellspermann decided to terminate Dr. Robinson-Cooper. (Dkt. 102-8 at 9.) On March 5, 2024, at 10:21 a.m., College Counsel Claire McRoberts emailed outside counsel about a "Robinson-Cooper separation agreement." (Dkt. 102-21 at 4 (REV_00000524).) At 10:25 a.m., McRoberts sent McNichols talking points for a meeting with Dr. Robinson-Cooper about the complaints made against her. (Dkt. 102-21 at 4 (REV_00000505).) The meeting began at 11:32 a.m. (Dkt. 81-33 at 1.) Nine minutes later, outside counsel sent McRoberts and McNichols another email about the separation agreement. (Dkt. 102-21 at 4 (REV_00000525).) The meeting ended at 12:59 p.m. (Dkt. 81-33 at 6.)

At the March 5 meeting, McNichols told Dr. Robinson-Cooper that Ivy Tech had

received two complaints and described their general themes, without identifying the complainants or specific incidents. (Dkt. 81-33 at 1.) Dr. Robinson-Cooper denied the allegations. (Dkt. 81-33 at 1–2.) She told them that decisions were being made without her knowledge and that staff had been told not to speak with her. (*Id.*) She also reported that the Systems Office had been contacting her staff to ask whether they would talk to HR about her. (Dkt. 81-33 at 4.)

On March 6, 2026, Dr. Robinson-Cooper met with McNic

Defendant replaced Dr. Robinson-Cooper with Patrick Englert, a white man. (Dkt. 102-1 at 95 (Robinson-Cooper Dep. at 94:1–9).) Before Defendant named Englert, LaTonya Armstrong ("Armstrong") served as interim chancellor. (Dkt. 81-7 at 6 (McNichols Decl. ¶ 19).) (Dkt. 102-29 at 1 (Robinson Aff. ¶ 6)) Before her termination, Defendant had asked Englert to shadow Dr. Robinson-Cooper to develop strategies from her enrollment and retention practices that could serve as a model across the state. (Dkt. 102-1 at 233–234 (Robinson-Cooper Dep. at 232:21–233:3).)

**j. Ellspermann responded to misconduct by white male leaders with leniency.**

a. **Former South Bend Chancellor David Balkin**

David Balkin, a male, was Chancellor of the South Bend-Elkhart campus before Dr. Robinson-Cooper. (Dkt. 102-7 at 48 (Ellspermann Dep. at 187:23–25); Dkt. 102-14 at 18, 22 (Ellspermann Carlin Dep. at 69:14–19, 83:13–14); Dkt. 102-6 at 69 (McNichols Cont. Dep. at 69:4–7).) He led aggressively and was unkind to his staff, and the campus's numbers declined under his leadership, particularly in the community. (Dkt. 102-3 at 17 (Hawkins Dep. at 60:13–21, 61:9–12).) He was also aggressive with his peers. He believed he was right, came across as aggressive, and the complaints against him may have included rudeness. (Dkt. 102-7 at 50 (Ellspermann Dep. at 196:19–197:9).)

Balkin's subordinates complained about his behavior and unprofessional conduct. (Dkt. 102-7 at 48 (Ellspermann Dep. at 188:13–18, 189:9–18); Dkt. 102-14 at 18–19 (Ellspermann Carlin Dep. at 69:20–70:15).) One of them, Karen White-Goyzueta, filed an EEOC charge while reporting to him. (Dkt. 102-7 at 50 (Ellspermann Dep. at 194:23–195:14).)

The campus was over budget under Balkin. When Ellspermann became president, South Bend was the only campus in the red. (Dkt. 102-3 at 18 (Hawkins Dep. at 62:8–10, 64:20–65:3).) Hawkins traveled to South Bend almost weekly to work with Balkin and his cabinet on the budget. Balkin refused to fix the problems, was not open to help, and kept the budget from being balanced. (Dkt. 102-3 at 18 (Hawkins Dep. at 62:8–63:10, 64:8–19); Dkt. 102-7 at 50 (Ellspermann Dep. at 195:24–196:18).) Balkin was also unpleasant and unkind to Hawkins himself. (Dkt. 102-3 at 18 (Hawkins Dep. at 62:14–21, 64:2–4).)

Ellspermann and Michelle Simmons knew about the complaints against Balkin and responded with informal coaching. Ellspermann coached him three to six times, and Simmons coached him about six to ten times. After each coaching he would improve, and then new complaints would come in. (Dkt. 102-7 at 48–49 (Ellspermann Dep. at 189:15–21, 190:19–192:9); Dkt. 102-14 at 19–20 (Ellspermann Carlin Dep. at 70:25–71:14, 74:9–75:15).)

Balkin never received a documented coaching, a last chance agreement, or any other discipline. He was not disciplined for the EEOC charge against him, and he was never terminated. (Dkt. 102-7 at 49–50 (Ellspermann Dep. at 190:3–18, 192:10–12, 195:15–20); Dkt. 102-14 at 19–20 (Ellspermann Carlin Dep. at 71:5–10, 75:16–22).)

b. **Richmond Chancellor Chad Bolser**

Chad Bolser, a Caucasian male, was Chancellor of the Richmond campus and reported directly to Ellspermann. (CITE) In June 2024, Ivy Tech received two EthicsPoint complaints alleging that Bolser was in an inappropriate relationship with his subordinate, Brandi Jackson,

that had lasted more than a year. (Dkt. 102-7 at 51 (Ellspermann Dep. at 198:3–200:4, 201:10–15); Dkt. 102-5 at 34–35 (McNichols Dep. at 133:3–13, 137:12–21).) The complaints alleged that the two wore matching outfits, posed too close together in pictures, and attended events alone together. (*Id.*) They also alleged that Bolser built Jackson an office giving her the most access to him and that the two fired an assistant together. (*Id.*) In follow-up messages, the reporter told McNichols that the two giggled together around campus, made flirty comments, and had their schedules arranged so they could be together. (Dkt. 102-5 at 36 (McNichols Dep. at 139:12–141:19).) The reporter also said that Bolser targeted anyone who crossed Jackson and that the relationship was widely discussed on campus and in the community. (*Id.*) On July 25, 2024, the reporter wrote that no progress had been made and that a meeting had been scheduled with the mayor. McNichols did not respond and closed the complaint that day. (Dkt. 102-5 at 36–37 (McNichols Dep. at 141:20–142:9); Dkt. 102-7 at 52 (Ellspermann Dep. at 202:17–203:7, 204:15–19).)

McNichols's investigation consisted of a single conversation with Bolser. (Dkt. 102-5 at 34–36 (McNichols Dep. at 133:20–135:12, 138:18–21).) Ellspermann testified that McNichols provided her with a summary of the complaint. (Dkt. 102-7 at 51–52 (Ellspermann Dep. at 200:17–201:3, 205:10–15).) Bolser was not disciplined or terminated. (Dkt. 102-7 at 53 (Ellspermann Dep. at 206:12–18); Dkt. 102-14 at 14 (Ellspermann Carlin Dep. at 50:25–51:23).) In 2022–2023, Ellspermann rated him as meeting expectations. (Dkt. 102-7 at 53 (Ellspermann Dep. at 207:21–208:16).) McNichols did not recall informing Ellspermann of the Bolser complaints and testified that doing so was Chase's responsibility. (Dkt. 102-5 at 37 (McNichols Dep. at 142:18–23, 144:13–16).)

c. **Sellersburg Chancellor Travis Haire**

Travis Haire is a white male. (Dkt. 102-7 at 69 (Ellspermann Dep. at 272:20–25).) In April

2019, at a student organization event in Florida, Haire bought a round of drinks for students, at least one of whom was underage. (Dkt. 102-7 at 33 (Ellspermann Dep. at 129:13–21).) His conduct violated Ivy Tech policy and was illegal. (Dkt. 102-7 at 33–34 (Ellspermann Dep. at 129:22–130:1).) Ellspermann gave Haire a written warning and did not terminate him. (Dkt. 102-7 at 34–35 (Ellspermann Dep. at 133:23–134:9).)

In 2022, a phlebotomy student at Sellersburg was exposed to human blood through a needle stick. (Dkt. 102-7 at 36 (Ellspermann Dep. at 139:21–140:1).) Haire did not elevate the incident in time, and it took him two weeks to notify the systems office. (Dkt. 102-7 at 36 (Ellspermann Dep. at 140:2–6).) Ellspermann placed Haire on a performance improvement plan dated July 28, 2022, which covered both the needle stick and the 2019 alcohol incident. (Dkt. 102-7 at 38 (Ellspermann Dep. at 147:23–148:9).) She did not terminate him. (Dkt. 102-7 at 38 (Ellspermann Dep. at 148:10–11).) Haire remained chancellor. (Dkt. 102-5 at 31 (McNichols Dep. at 120:6–8).) Ellspermann rated Haire "Exceeds Expectations" overall for 2022. (Dkt. 102-7 at 47 (Ellspermann Dep. at 183:14–22).) She completed that evaluation in August 2022, the month after the PIP. (Dkt. 102-7 at 47 (Ellspermann Dep. at 184:16–24).)

Haire also made inappropriate comments in front of employees. At a campus event, after an HR staff member fixed the microphone pack on his belt, Haire said so the group could hear that HR "really knows how to turn me on." (Dkt. 102-4 at 34–35 (Chase Dep. at 136:19–137:5).) McNichols heard about the comment, but did not investigate it. (Dkt. 102-5 at 33–34 (McNichols Dep. at 129:1–131:11).)

Employees filed many EthicsPoint complaints about Haire. A February 2020 complaint named Haire as a manager involved in the reported conduct. (Dkt. 102-5 at 25–26 (McNichols Dep. at 97:18–98:23).) Another 2020 complaint alleged that, after the PTK trip, students were

intimidated and coerced into dropping their complaints, and that procedures were not followed because of Haire's involvement. (Dkt. 102-7 at 41–42 (Ellspermann Dep. at 161:3–163:5).) A June 2020 complaint alleged intimidation, bullying, unequal treatment, and a "Good Ole Boy system." (Dkt. 102-7 at 43–44 (Ellspermann Dep. at 166:13–170:19).) In September 2021, employees filed several more complaints:

- Haire targeted staff to be fired and created a stressful environment. (Dkt. 102-7 at 44 (Ellspermann Dep. at 170:20–173:21).)
- He issued threats and inappropriate directives, lacked transparency, and silenced staff. (Dkt. 102-7 at 39 (Ellspermann Dep. at 151:6–17).)
- He unjustly terminated an employee as part of a vendetta. (Dkt. 102-7 at 45–46 (Ellspermann Dep. at 174:3–178:9).)
- Haire and his second-in-command, Tyiana Thompson, created a "toxic work environment." (Dkt. 102-5 at 27–28 (McNichols Dep. at 105:16–106:8).)

An October 2021 complaint alleged that Haire was defensive and argumentative and showed favoritism. (Dkt. 102-7 at 41 (Ellspermann Dep. at 158:22–159:14).) Another complaint alleged an inappropriate relationship between Haire and Thompson, including that she called him "Big Daddy" on campus. (Dkt. 102-4 at 37 (Chase Dep. at 146:1–9).) A December 2021 complaint again named Haire and Thompson. (Dkt. 102-5 at 28 (McNichols Dep. at 109:12–16).) An April 2024 complaint alleged racism in how Haire pronounced the name of an Indian faculty member at an awards event. (Dkt. 102-5 at 29 (McNichols Dep. at 111:18–112:11).) Haire was not disciplined as a result of any of these complaints. (Dkt. 102-5 at 39–46 (McNichols Dep. at 150:25–178:9).)

Ellspermann testified that McNichols found the Thompson complaints unsubstantiated. (Dkt. 102-14 at 16 (Ellspermann Carlin Dep. at 60:21–61:10).) For the April 2024 racism complaint, McNichols worked through the campus HR lead, who spoke with the faculty member. (Dkt. 102-5 at 29 (McNichols Dep. at 112:18–113:22).) McNichols did not remember whether he

spoke with Haire. (Dkt. 102-5 at 30 (McNichols Dep. at 115:7–13).) McNichols did not investigate the needle stick and did not know who did. (Dkt. 102-5 at 30 (McNichols Dep. at 117:1–6).) He also did not know whether anyone was interviewed. (Dkt. 102-5 at 30–31 (McNichols Dep. at 117:21–118:1).)

d. **Foundation President John Murphy**

John Murphy is a white male. (Dkt. 102-4 at 43 (Chase Dep. at 171:13–16).) He was President of the Ivy Tech Foundation and reported directly to Dr. Ellspermann, who completed his performance evaluations. (Dkt. 102-7 at 54 (Ellspermann Dep. at 211:17–23).) Kevin Honigford was the Foundation's CFO and reported to Murphy. (Dkt. 102-14 at 21 (Ellspermann Carlin Dep. at 81:12–18).) Honigford filed a complaint that Murphy, in front of him, called Matt Hawkins a"fucking faggot" (Dkt. 102-7 at 54 (Ellspermann Dep. at 213:2–25)) Honigford also complained that Murphy was falsifying Emplify employee-engagement scores, and Ellspermann believed that was true. (Dkt. 102-7 at 55 (Ellspermann Dep. at 214:8–11).) He further complained that Murphy was creating a hostile work environment. (Dkt. 102-7 at 55 (Ellspermann Dep. at 214:12–15).)

Ellspermann testified that Murphy's conduct was unprofessional and inappropriate: using the slur in front of a subordinate, falsifying Emplify scores, and creating a hostile work environment. (Dkt. 102-7 at 57 (Ellspermann Dep. at 222:4–13).) She also testified that the conduct was not appropriate for a president of the college or the Foundation, and that the college would be better without him in that position. (Dkt. 102-14 at 18 (Ellspermann Carlin Dep. at 68:16–21).) However, Ellspermann did not discipline Murphy. (Dkt. 102-7 at 55 (Ellspermann Dep. at 215:1–3).) She did not recommend that he be terminated. (Dkt. 102-7 at 56 (Ellspermann Dep. at 218:6–9).) According to Chase, no one recommended Murphy's termination. (Dkt. 102-4 at 43–44 (Chase Dep. at 172:19–173:3).) Murphy was not terminated. (Dkt. 102-7 at 56 (Ellspermann Dep. at 219:12–13).) Murphy resigned and received a 12-month independent

contractor's agreement. (Dkt. 102-14 at 18 (Ellspermann Carlin Dep. at 66:13–20); Dkt. 102-4 at 28 (Chase Dep. at 109:13–110:18).) Ivy Tech paid him under that contract for about a year. (Dkt. 102-4 at 28 (Chase Dep. at 109:13–110:18).) The contract had no list of duties. (Dkt. 102-7 at 56 (Ellspermann Dep. at 219:22–220:6).) Murphy had no office at Ivy Tech. (Dkt. 102-7 at 56 (Ellspermann Dep. at 220:7–8).) Ellspermann never saw him do any work under the contract. (*Id.* 220:23–221:4

Chase considered Murphy's performance poor. (Dkt. 102-4 at 29 (Chase Dep. at 115:17–22).) He testified that Murphy was territorial and withheld information. (Dkt. 102-4 at 29 (Chase Dep. at 115:24–116:3).) Grants under Murphy's purview had program audit findings. (Dkt. 102-4 at 29 (Chase Dep. at 116:4–8).) Checks were not deposited on time. (Dkt. 102-4 at 29 (Chase Dep. at 116:9–10).) Donors received incorrect information about their donations. (Dkt. 102-4 at 29 (Chase Dep. at 116:10–12).) Technology projects did not advance. (Dkt. 102-4 at 29 (Chase Dep. at 116:12–14).) Chase also testified that the Foundation was not transparent about its fundraising and counted items that should not have counted toward its goals. (Dkt. 102-4 at 29 (Chase Dep. at 116:14–19).)

e. **Muncie Chancellor Jeff Scott**

Jeff Scott, a white male, was Chancellor of the Muncie campus and reported directly to Dr. Ellspermann. (Dkt. 102-7 at 57, 70 (Ellspermann Dep. at 222:25–223:5, 274:5–7).) In 2021, Ellspermann placed Scott on a performance improvement plan because his campus had repeat audit findings on a large federal grant. (Dkt. 102-7 at 57 (Ellspermann Dep. at 223:6–12).) The findings put the entire college at risk of losing the grant. (Dkt. 102-7 at 57 (Ellspermann Dep. at 223:13–15).) Ellspermann testified that Scott put the financial health of the college at risk. (Dkt. 102-7 at 58 (Ellspermann Dep. at 226:2–4).) The audit findings first arose in 2017, while Scott reported to Ellspermann. (Dkt. 102-7 at 57 (Ellspermann Dep. at 224:4–8).)

The first time Scott's campus received the audit finding, Ellspermann coached him verbally and told him it was extremely important to fix. (Dkt. 102-7 at 58 (Ellspermann Dep. at 226:5–11).) Scott did not fully fix it, and the finding appeared again in the audit. (Dkt. 102-7 at 58 (Ellspermann Dep. at 226:12–24).) After the second finding, Ellspermann issued the PIP. (Dkt. 102-7 at 57 (Ellspermann Dep. at 225:5–8).) Still in 2021, Ellspermann gave Scott an overall rating of "Exceeds Expectations." (Dkt. 102-7 at 57–58 (Ellspermann Dep. at 223:6–8, 227:5–7).)

## III. PLAINTIFF'S OBJECTIONS TO DEFENDANT'S MATERIAL FACTS IN DISPUTE

**1.** Defendants now say the last chance agreement rested on a breach of confidentiality: that Dr. Robinson-Cooper disclosed the January 30 complaint after McNichols told her to keep it confidential. (Dkt. 84 at 8–9.) McNichols never gave that instruction. No one at Ivy Tech told Dr. Robinson-Cooper that the complaint was confidential. (Dkt. 102-20 at 4 (Robinson-Cooper Aff. ¶ 29).) Ellspermann conceded that she does not believe any written policy prohibits an employee from discussing her own complaint. (Dkt. 102-7 at 66 (Ellspermann Dep. at 261:14–19).) Defendants' brief is also the third account of why Ivy Tech issued the agreement. Ivy Tech's verified interrogatory answers identify four complaints as the grounds: December 7, 2023; December 28, 2023; January 30, 2024; and February 7, 2024. (Dkt. 102-8 at 7 (Def.'s Ans. to Interrog. No. 4).) The December 28 complaint alleged that Dr. Robinson-Cooper complained to her staff about her documented coaching and Systems Office leadership. (*Id.*) No one ever discussed that complaint with her, and she never complained to her staff about either subject. (Dkt. 102-1 at 161–162, 323–324 (Robinson-Cooper Dep. at 160:23–161:4, 322:20–323:6).) The interrogatory answers say nothing about Dr. Robinson-

Cooper discussing a complaint with members of her cabinet. They also say nothing about faculty and staff concerns over trust or psychological safety. (Dkt. 102-8 at 7.) The brief, by contrast, moves the December complaints to the evaluation and rests the agreement on confidentiality. (Dkt. 84 at 7–9.)Ellspermann, who issued the agreement, gave a different account again. She testified that she issued it based on additional EthicsPoint complaints, reports of a hostile work environment from the HR manager and others, Cyndy Keeling's documentation of meetings, and Dr. Robinson-Cooper's demeanor in those meetings. (Dkt. 102-7 at 66 (Ellspermann Dep. at 259:7–17).) None of the EthicsPoint complaints alleges that Dr. Robinson-Cooper created a hostile work environment. (Dkt. 81-14 at 1; Dkt. 81-20 at 1; Dkt. 81-21 at 1; Dkt. 81-27 at 1; Dkt. 81-52 at 1.) The agreement does not say she created one either. (Dkt. 102-19 at 1–6.) And Keeling's complaint, like Joseph Wheatly's, is dated March 1, 2024, two weeks after the agreement was issued. (Dkt. 81-31 at 1; Dkt. 81-32 at 1.) Ellspermann could not have relied on a complaint that did not yet exist. Ivy Tech has now given at least three explanations for one decision.

**2.** Defendants now say Ellspermann fired Dr. Robinson-Cooper because she "lost confidence" in her after two staff complaints filed on March 1 and March 4, 2024. They add that Dr. Robinson-Cooper failed to accept responsibility at a March 5 meeting. (Dkt. 84 at 9.) But Ivy Tech was preparing her separation before that meeting began. At 10:21 a.m. on March 5, College Counsel Claire McRoberts emailed outside counsel about a "Robinson-Cooper separation agreement." (Dkt. 102-21 at 4 (REV_00000524).) Four minutes later, McRoberts sent McNichols talking points for the meeting with Dr. Robinson-Cooper about the complaints. (Dkt. 102-21 at 4 (REV_00000505).) The meeting began at 11:32 a.m. (Dkt. 81-33 at 1.) Nine minutes into it, outside counsel sent McRoberts and McNichols another email

about the separation agreement. (Dkt. 102-21 at 4 (REV_00000525).) The meeting did not end until 12:59 p.m. (Dkt. 81-33 at 6.) Ivy Tech was drafting Dr. Robinson-Cooper's separation agreement before she had said a word in her own defense.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if Defendant "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the evidence in the light most favorable to Dr. Robinson-Cooper and draws all reasonable inferences in her favor. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). It does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Knight v. City of Carmel*, No. 1:22-cv-02150-JRS-MKK, 2024 WL 2800210, at *1 (S.D. Ind. May 3, 2024) (quoting *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022)). The question is simply whether a reasonable jury could believe Dr. Robinson-Cooper's evidence and find in her favor. *Id.* at *5.

## V. LEGAL STANDARD FOR RACE AND SEX DISCRIMINATION

To establish a *prima facie* case of discriminatory termination, Dr. Robinson-Cooper must show that (1) she is a member of a protected class; (2) she was meeting Defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Once the plaintiff establishes a *prima facie* case and the employer articulates a legitimate reason for its decision, the burden shifts back to the plaintiff to show that the reason is pretextual. *Coleman*, 667 F.3d at 845. Once pretext is shown, the trier of fact may infer discrimination.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

The Seventh Circuit asks a single question in every discrimination case: whether the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race, sex, or other protected characteristic caused her discharge. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Burton v. Will Cnty. Sheriff's Merit Comm'n*, 176 F.4th 544, 548 (7th Cir. 2026).

## ARGUMENT

### VI. A reasonable jury could find that Dr. Robinson-Cooper's race and sex motivated her termination.

#### a. Dr. Robinson-Cooper is a member of a protected class and suffered an adverse action.

The first and third elements are undisputed. Dr. Robinson-Cooper is a Black woman, and on March 6, 2024, Defendant fired her. (Dkt. 102-8 at 4, 19.)

#### b. Whether Dr. Robinson-Cooper was meeting Defendant's legitimate expectations merges with pretext.

Ellspermann hired Dr. Robinson-Cooper to "right the ship" at a struggling campus carrying a $2 to $3 million deficit. Ellspermann admits that enrollment, retention, and finances all improved under her leadership. Dr. Robinson-Cooper balanced the budget, built about 235 days of reserves, and raised retention from 44.4% to 48.4%. Ellspermann rated her "Exceeds Expectations" in December 2022. In January 2024, three weeks before the Last Chance Agreement, Ellspermann wrote that she had met all of her Wildly Important Goals except online retention. A reasonable jury could find she was meeting Ivy Tech's legitimate expectations. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Even if the Court were not persuaded by this testimony, it need not resolve the second element separately. When a plaintiff contends that her employer applied its expectations or disciplinary policies to her in a discriminatory manner, the second and fourth elements of the prima

facie case merge, and the analysis proceeds directly to pretext. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007); *Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001); *see also Coleman*, 667 F.3d at 858 ("Where the plaintiff argues that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question.").

**c. Defendant treated similarly situated white male leaders more favorably.**

Employees are similarly situated when they dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without differentiating or mitigating circumstances. *Coleman*, 667 F.3d at 847. Balkin, Bolser, Haire, Murphy, and Scott all reported directly to Ellspermann, and she made every disciplinary decision for them and for Dr. Robinson-Cooper. *See* Parts II.b, II.j. All of them were bound by the same conduct and discipline policies. Ellspermann agreed that the same misconduct should bring the same accountability, no matter which chancellor commits it. (Dkt. 102-7 at 13 (Ellspermann Dep. at 48:19–49:1).)

The only remaining question is whether these employess engaged in similar conduct. In a discipline case, "the critical question is whether [the employees] have engaged in conduct of comparable seriousness." *Coleman*, 667 F.3d at 851 (quoting *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007)). Comparators need only have engaged in "similar—not identical—conduct." *Id.* at 851. When a comparator broke the same rules "in an equivalent or more serious manner, courts should not demand strict factual parallels." *Id.* at 851. Otherwise, lenient treatment of an employee who committed "a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination." *Id.* (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 488 (8th Cir. 1998)). Each of these employees engaged in conduct as serious as, or more serious than, anything attributed to Dr. Robinson-Cooper, and none of them was fired.

**i. Haire's misconduct was more serious than anything attributed to Dr. Robinson-Cooper.**

Ellspermann testified that two kinds of conduct warrant immediate termination: knowingly breaking the law and endangering a student's health and safety. Haire did both.On a 2019 student trip, Haire bought drinks for students, including a minor. That was a crime and a violation of Ivy Tech policy. Chase, who oversaw HR, called it gross misconduct and a terminable offense. Ellspermann gave Haire a written warning.

Haire then left a student's life at risk. A phlebotomy student was stuck with a needle carrying human blood, and Haire waited two weeks to report it. Chase testified that the student could have contracted an incurable disease or died. Ellspermann put Haire on a PIP. One month later, she rated him "Exceeds Expectations," the highest rating Ivy Tech gives.

Complaints followed Haire for years. His employees reported bullying, a "Good Ole Boy system," staff targeted for firing, a "toxic work environment," students pressured to drop complaints, and a racist joke about a faculty member's name. He told employees that an HR staffer "really knows how to turn me on" and let a subordinate call him "Big Daddy" on campus. Ellspermann never reviewed those complaints. McNichols could not remember investigating them. None led to discipline.

Set against Haire's record, everything Ivy Tech holds against Dr. Robinson-Cooper is minor workplace friction. Her documented coaching rested on a "brash" email to a colleague, a colleague's belief that she was upset, and an EthicsPoint calling her angry. No one asked for her side before issuing it. The complaints that followed were no more serious. A dinner guest reported that she covered her ears while talking about another chancellor's loud voice. A staff member complained that she discussed her coaching. A trustee's guest objected to a prayer at a campus holiday dinner. Another complaint said she mentioned that prayer complaint to other

chancellors. Ivy Tech placed her on a Last Chance Agreement for these complaints. Three weeks later, it fired her after two subordinates, one of whom she had just coached, complained about her management style.

None of this conduct was illegal, and none of it endangered anyone. By Ellspermann's own testimony, a single unprofessional act warrants at most a documented warning, not termination. Haire committed two acts that Ellspermann agrees warrant immediate termination. He received a warning and a PIP, and then an "Exceeds Expectations" rating. Dr. Robinson-Cooper was accused of rudeness, an ill-timed prayer, and talking about her own discipline, and she lost her job. Ellspermann applied a termination standard to Dr. Robinson-Cooper that she declined to apply to Haire.

Ivy Tech cannot enforce its rules against one employee "while dismissing dangerous acts of others," and the Court is "not bound by the labels that an employer uses." *Coleman*, 667 F.3d at 851 (quoting *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891 (7th Cir. 2001)). Labeling Haire's complaints "unsubstantiated" when no one investigated them does not change what he did. That is "enough to permit a reasonable inference of discrimination," *id.* at 852, and it shows that Ellspermann "did not enforce [the] rule evenhandedly," which is evidence of pretext, *id.* at 853; *see* Part [E].

**ii. Balkin led the same campus worse and was never disciplined.**

Balkin, Dr. Robinson-Cooper's predecessor at South Bend–Elkhart, was aggressive and unkind to his staff, his peers, and Ivy Tech's own Executive Vice President. His subordinates complained repeatedly about his unprofessional conduct. One, Karen White-Goyzueta, filed an EEOC charge of race discrimination while reporting to him. Ellspermann coached him informally three to six times, and Simmons coached him another six to ten. Each time he

improved for a while, and then new complaints came in. That cycle is exactly what progressive discipline exists to address. Yet Balkin never received a documented coaching, a last chance agreement, or any discipline, including for the EEOC charge.

He also failed at the job. The campus's numbers declined under him, and by the time Ellspermann became president, South Bend was the only campus in the red. Hawkins traveled there almost weekly to help him balance the budget. Other struggling campuses accepted that help and fixed their budgets quickly. Balkin refused it. He kept his job until he chose to leave for New York.

Dr. Robinson-Cooper inherited the campus Balkin left behind. She balanced its budget, built about 235 days of reserves, and raised retention. The complaints against her were minor by comparison: a brash email, a colleague's impression that she was upset, a remark about another chancellor's loud voice, a holiday prayer, and talking about her own discipline. None involved an EEOC charge, a budget crisis, or refusing help. Within four months she went from a documented coaching to a last chance agreement to termination.

Ellspermann agreed that the same misconduct should bring the same accountability. Balkin's was more serious and last for a little more than a year, and it brought sixteen informal conversations. Dr. Robinson-Cooper's was minor, and it brought formal discipline at every step and her termination. A jury could reasonably find that the difference was race and sex. *Coleman*, 667 F.3d at 852.

**iii. Murphy used a homophobic slur, falsified engagement scores, and was given a paid exit.**

Murphy's own CFO, Murphy, a Senior Vice President, was reported by his own CFO, Kevin Honigford. Honigford said Murphy called Hawkins a "fucking faggot" in front of him,

created a hostile work environment, and falsified the Foundation's employee-engagement scores. Ellspermann believed the falsification allegation was true.

That last allegation matters most. Defendants fault Dr. Robinson-Cooper for her campus's engagement scores, even though Ellspermann would "never expect" a new chancellor to move engagement. Murphy didn't just miss an engagement goal. Ellspermann believed he faked the data.

Ellspermann called Murphy's conduct unprofessional and inappropriate and said the college would be better off without him in the role. Chase called the slur egregious misconduct and a terminable offense. Murphy's performance was also poor: grants under him had audit findings, checks went undeposited, donors received incorrect information, and the Foundation counted items toward its fundraising goals that should not have counted. Ellspermann considered "every option," from a documented warning to termination. She chose none of them. No one recommended firing him, and he was never disciplined. He resigned with a 12-month independent contractors agreement. The contract listed no duties, he had no office, and Ellspermann never saw him do any work.

Dr. Robinson-Cooper used no slurs and falsified nothing. She was accused of a brash email, a remark about another chancellor's voice, a holiday prayer, and talking about her own discipline. She received no negotiated exit and no contract. She received a last chance agreement and, three weeks later, termination.

For conduct Ivy Tech's own executive called terminable, and for failing the very metric used against Dr. Robinson-Cooper, Murphy got a paid year and a soft landing. Dr. Robinson-Cooper's minor conduct cost her her career. Under *Coleman*, a jury may infer that the difference was race and sex. 667 F.3d at 851–52.

**iv. Bolser faced complaints of an inappropriate relationship, yet he kept his job.**

In June 2024, two EthicsPoint complaints reported that Bolser had been in an inappropriate relationship with his subordinate, Brandi Jackson, for more than a year. The reporter said he built her an office with private access to him, that the two arranged their schedules to be together, that he targeted anyone who crossed her, and that the relationship was talked about across campus and the community. Ellspermann agreed that even the perception of such a relationship is a problem for a chancellor.

McNichols's investigation was a single conversation with Bolser, who denied it. McNichols didn't remember speaking with anyone else, and Ivy Tech's case file records no notes, no findings, and no outcome. The reporter wrote that no progress had been made and that she had scheduled a meeting with the mayor. McNichols closed both complaints that same day. Ellspermann called the complaint "a little comical" and assumed it had been investigated. Bolser was never disciplined.

Ivy Tech treated the complaints against Dr. Robinson-Cooper as true and fired her over them. Calling the Bolser complaints "comical" is the same move. When a decisionmaker laughs off complaints about a white man but fires a Black woman over lesser ones, a jury may infer that the stated reasons are not the real ones. *Id.* at 853, 858–59.

**v. Scott put the college's federal funding at risk for years and received a PIP and an "Exceeds" rating.**

Scott's campus had repeat audit findings on the college's federal Student Support Services grant, starting in 2017. He knew about them, and they caused the college to fail its audit and put the entire grant at risk. Ellspermann testified that Scott put the college's financial health

at risk. She coached him verbally and told him to fix it. He didn't, and the finding came back. Only then did she place him on a PIP. That same year, she rated him "Exceeds Expectations," the highest rating available.

Dr. Robinson-Cooper did the opposite. She inherited a deficit, balanced the budget, and built about 235 days of reserves. Ellspermann agreed that nothing she did put the college's finances at risk. Yet she went from a documented coaching to a last chance agreement to termination in four months. Ellspermann testified that more serious misconduct warrants greater discipline. Scott's was more serious, and he received less. When the same decisionmaker gives a white man years of patience and a top rating for jeopardizing federal funding, but fires a Black woman over minor complaints, a jury may infer that the stated reasons are not the real ones. *Coleman*, 667 F.3d at 853, 858–59.

Whether a comparator is similarly situated is "usually a question for the fact-finder." *Coleman*, 667 F.3d at 846–47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). At this stage, Dr. Robinson-Cooper's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. Taken that way, the record shows five men who answered to the same decisionmaker and did far worse, yet received substantially less discipline.

Dr. Robinson-Cooper broke no law, endangered no one, and put no funding at risk. She was the only one fired. Defendants may argue that her conduct was somehow worse, but that is a credibility contest for the jury. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 742 (7th Cir. 2013) ("We leave it to the jury to decide whom to believe."). A reasonable jury could find these men similarly situated and treated far better. Summary judgment on this element should be denied.

**d. Dr. Robinson-Cooper independently satisfies the fourth element because Defendant replaced her with a white man.**

Dr. Robinson-Cooper also meets the fourth element a second way: Ivy Tech replaced her with someone outside her protected classes. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007); *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996). Her permanent replacement was Patrick Englert, a white man, whom Ivy Tech had earlier sent to shadow her so her enrollment and retention practices could serve as a statewide model. Defendants point to LaTonya Armstrong's interim service, but the element turns on who "ultimately filled" the position. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Defendants' own brief identifies Englert as "the current South Bend/Elkhart Chancellor." (Dkt. 84 at 22.)

**e. Defendant's stated reason is pretextual.**

Dr. Robinson-Cooper can prove that the reason Defendant gave for her termination is pretextual. The Seventh Circuit has stated that a Plaintiff can prove pretext in several different ways. Plaintiff can prove pretext by showing that similarly situated employees outside of her protected class who engaged in similar conduct were treated more favorably. *Coleman*, 667 F.3d at 845. Plaintiff can prove pretext by showing that the Defendant's proffered reason is unworthy of credence. *Gordon*, 246 F.3d at 888–89; *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, (7th Cir. 2001). Plaintiff may demonstrate that the Defendant's reasons are unworthy of credence and therefore pretext by evidence showing at least one of the following: (1) Defendant's explanation has no basis in fact, (2) the explanation was not the real reason, and (3) the reason was insufficient to warrant the action taken. Id. Finally, Plaintiff can prove pretext by showing that Defendant has shifted or given inconsistent reasons for Plaintiff's termination. *Appelbaum v. Milwaukee Metro. Sewerage Dist.,* 340 F.3d 573, 579 (7th Cir. 2003) (citing *Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 931-32 & n.13 (7th Cir. 2001); *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1422 (7th Cir. 1992) (additional citations omitted)).

**i. Ivy Tech's reasons for the last chance agreement keep shifting.**

Ivy Tech has given at least three versions of why it issued the last chance agreement, and each one adds grounds the previous one left out. Version one is the agreement itself. It relies on three EthicsPoint complaints, dated December 7, January 30, and February 7. It says nothing about a December 28 complaint and nothing about Dr. Robinson-Cooper discussing her coaching with staff. Version two is Ivy Tech's verified interrogatory answers, served three times in early 2026. Each time, Ivy Tech added the December 28 complaint, which alleged that she complained to her staff about her coaching. Version three came from Ellspermann, who made the decision. She said she issued the agreement because of "several more occurrences," including Cyndy Keeling's documentation. Keeling didn't file her complaint until March, after the agreement was signed. Ellspermann also cited Dr. Robinson-Cooper telling subordinates about her coaching and talking to an Indiana Chamber contact. The agreement mentions none of this, and Ellspermann conceded that no written policy she knows of forbids discussing one's own coaching.

**ii. Ivy Tech's reasons for the termination keep changing.**

The explanations for her termination shift the same way. Ivy Tech's interrogatory answers say she was fired for violating the last chance agreement. McNichols that she was fired for unprofessional behavior "from the onset of her employment" and never mentioned the agreement. Ellspermann added campus performance.

Ivy Tech's account of when and how it decided doesn't hold together either. Its brief says it met with Dr. Robinson-Cooper on March 5 to give her "a meaningful opportunity to respond," and that only "[a]fter that process" did it decide to fire her. Ivy Tech's own records say otherwise. At 10:21 a.m. on March 5, College Counsel was already emailing outside counsel about her separation agreement. The meeting didn't begin until 11:32 a.m. Nine minutes in,

outside counsel sent another email about the separation agreement. Ivy Tech's verified interrogatory answer says the decision was made on March 5, and its brief says March 6. Ivy Tech was preparing her separation papers before she said a word. The "opportunity to respond" was a formality, and an employer that decides first and asks questions later has not honestly relied on the answers.

"One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005)). Each time Ivy Tech explains itself, it adds new grounds, including a complaint that didn't exist when it acted. A jury could find that Ivy Tech did not "honestly believe[ ] the reasons it has offered." *Id.* at 740 (quoting *Coleman*, 667 F.3d at 852). Combined with the white men who kept their jobs after far worse misconduct, this creates a genuine dispute about pretext. *See id.* at 742 ("We leave it to the jury to decide whom to believe.").

**f. Dr. Robinson-Cooper has Presented Specific Evidence to Rebut Defendant's Honest Belief**

Dr. Robinson-Cooper has presented substantial evidence to call into question Defendant's alleged honest belief. Simply because a Defendant claims "honest belief" does not mean the Court must accept the Defendant's word. The Seventh Circuit has stated:

> Indeed, we have stated that a "determination of whether a belief is honest is often conflated with analysis of reasonableness," *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 516 (7th Cir. 1999); "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held," id. Our cases therefore have acknowledged that we need not take an employer at its word. For instance, we have held that when an employee provides "[a] detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460–61 (7th Cir. 1994). Furthermore, "[i]f the employee offers specific evidence from which the finder of fact

> may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Dey,* 28 F.3d at 1461. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation ..." Id.

*Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

Dr. Robinson-Cooper has presented specific evidence that shows that Ivy Tech's given reason for terminating her could not be the real reason in light of its treatment of Balkin, Bolser, Murphy, Haire and Scott and in light of its shifting reasons. In other words, Defendant's reason is pretext.

A jury "can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. Thus, a juror can infer that the Defendant intentionally discriminated against Dr. Robinson-Cooper because of Defendant's untruthfulness, its shifting reasons, and treating Balkin, Bolser, Murphy, Haire and Scott more favorably than Dr. Robinson-Cooper. Therefore, summary judgment must be denied.

## VII. A reasonable jury could find that Defendant interfered with Dr. Robinson-Cooper's FMLA rights.

To prevail on her FMLA interference claim, Dr. Robinson-Cooper must show: (1) she was eligible for FMLA leave; (2) Defendant is an employer covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her need for FMLA leave; and (5) Defendant denied her FMLA benefits to which she was entitled. *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). The Seventh Circuit has since clarified that the fifth element is satisfied when the employer "denied or interfered with" FMLA benefits; an actual denial of leave is not required. *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022). The employee must also show prejudice, meaning harm resulting from the violation. *Id.* at 1084–85.

It is undisputed that Defendant, a public agency with about 5,390 employees, is a covered employer, and that Dr. Robinson-Cooper, who needed knee surgery requiring three months off work, was entitled to leave. (Dkt. 102-8 at 4, 11); 29 U.S.C. §§ 2611(4)(A)(iii), 2612(a)(1)(D). It is undisputed that by January 2024 Dr. Robinson-Cooper was eligible for FMLA leave, having worked full-time for Defendant since July 11, 2022, which is more than twelve months and more than 1,250 hours; that Defendant, a public agency with about 5,390 employees, is a covered employer; and that Dr. Robinson-Cooper, who needed knee surgery requiring three months off work, was entitled to leave. (Dkt. 102-8 at 4, 11; Dkt. 102-20 at 5 (Robinson-Cooper Aff. ¶¶ 32–33)); 29 U.S.C. §§ 2611(2)(A), 2611(4)(A)(iii), 2612(a)(1)(D).Thus Plaintiff meets the first, second and third elements of her interference claim.

**a. Dr. Robinson-Cooper gave sufficient notice.**

In January 2024, Dr. Robinson-Cooper told Ellspermann that her knee surgery had been scheduled and that she would need leave. (Dkt. 102-1 at 308–309 (Robinson-Cooper Dep. at 307:18–308:1).) An employee requesting foreseeable leave need not expressly invoke the FMLA or even mention it. 29 C.F.R. § 825.302(c). And Defendant already knew of her condition: a year earlier, she had told Ellspermann about the same surgery and the three months of recovery it would require. (Dkt. 102-8 at 4.) Once on notice, the employer must inform the employee of her eligibility for FMLA leave within five business days. 29 C.F.R. § 825.300(b)(1). Ellspermann instead told her she did not need FMLA leave. Ellspermann does not recall whether she knew of the 2024 surgery. (Dkt. 102-7 at 67–68 (Ellspermann Dep. at 265:10–266:4).) Whether Dr. Robinson-Cooper gave notice is therefore a disputed fact the jury must resolve.

**b. Defendant interfered with Dr. Robinson-Cooper's FMLA rights.**

The FMLA makes it unlawful "to interfere with, restrain, or deny" the exercise of FMLA rights. 29 U.S.C. § 2615(a)(1). Denial is only one of those prohibitions. "[A]n employer can

violate the FMLA by discouraging an employee from exercising rights under the FMLA without actually denying an FMLA leave request." *Ziccarelli*, 35 F.4th at 1081; *accord* 29 C.F.R. § 825.220(b).

Ellspermann discouraged Dr. Robinson-Cooper from taking leave. In January 2024, when Dr. Robinson-Cooper said her surgery was scheduled and she would need leave, Ellspermann told her she did not need FMLA leave for knee surgery and could keep working with her camera off. (Dkt. 102-1 at 309 (Robinson-Cooper Dep. at 308:17–24).) Because of those comments, Dr. Robinson-Cooper did not request leave. (Dkt. 102-1 at 309–310 (Robinson-Cooper Dep. at 308:25–309:5).) Ellspermann had sent the same message in 2023, telling her that her eighty-year-old mother was walking two days after knee surgery. (Dkt. 102-1 at 119 (Robinson-Cooper Dep. at 118:10–20).) Defendant admits that, instead of leave, Ellspermann offered flexible hours and remote work "to ensure she could continue in her role." (Dkt. 102-8 at 4.)

Defendants' authorities do not help them. Here, the procedures were offered in 2023, before Dr. Robinson-Cooper was eligible. (Dkt. 84 at 4–5.) In 2024, no one sent her FMLA paperwork, and the president told her she did not need leave. *Otero v. Ind. Harbor Belt R.R. Co.*, 664 F. Supp. 3d 860, 871 (N.D. Ind. 2023), a district court decision, cannot narrow *Ziccarelli*. And Mia Johnson's approved leave proves nothing: a vice president later told Johnson that her leave was "null and void." (Dkt. 102-2 at 10 (Johnson Dep. at 31:9–20).) Ellspermann denies discouraging Dr. Robinson-Cooper (Dkt. 102-7 at 68 (Ellspermann Dep. at 266:5–9)), but that conflict is for the jury. *Anderson*, 477 U.S. at 255.

Defendant then fired Dr. Robinson-Cooper before she could take any leave. Her surgery was scheduled for March 8, 2024, and Defendant fired her on March 6, two days earlier. (Dkt. 102-1 at 293 (Robinson-Cooper Dep. at 292:1–11).) In *Goelzer*, the Seventh Circuit reversed

summary judgment on an interference claim where the employer fired the plaintiff two weeks before her scheduled leave. 604 F.3d at 993–96. Here, the gap was two days.

#### c. Dr. Robinson-Cooper was prejudiced.

An FMLA interference plaintiff must show that the violation harmed her. *Ziccarelli*, 35 F.4th at 1084–85. Dr. Robinson-Cooper was harmed. Because Ellspermann told her she did not need leave, she never requested the twelve weeks of job-protected leave the FMLA guarantees. (Dkt. 102-1 at 309–310 (Robinson-Cooper Dep. at 308:25–309:5).) Two days before her scheduled surgery, Defendant fired her. (Dkt. 102-1 at 293 (Robinson-Cooper Dep. at 292:1–11).) That same day, she was told her employer-paid health insurance would end at midnight. (Dkt. 102-20 at 5 (Robinson-Cooper Aff. ¶ 39).) Had she been on FMLA leave, Defendant would have been required to maintain her group health coverage on the same terms throughout the leave. 29 U.S.C. § 2614(c)(1). Instead, she underwent surgery on March 8 without the job, pay, or employer-paid insurance that FMLA leave would have protected. (Dkt. 102-1 at 300–301 (Robinson-Cooper Dep. at 299:21–300:2).) That is concrete harm.

## VIII. A reasonable jury could find that Defendant retaliated against Dr. Robinson-Cooper for seeking FMLA leave.

To succeed on an FMLA retaliation claim, Dr. Robinson-Cooper must show that (1) she engaged in statutorily protected activity; (2) Defendant took an adverse action against her; and (3) the protected activity caused the adverse action. *Chitwood v. Ascension Health All.*, 168 F.4th 493, 498 (7th Cir. 2026). Retaliation requires proof of the employer's intent, which may be shown through circumstantial evidence. *Id.*; *Goelzer*, 604 F.3d at 995. "[S]uspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528–29 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

**a. Dr. Robinson-Cooper engaged in protected activity and suffered an adverse action.**

In January 2024, Dr. Robinson-Cooper told Ellspermann that her knee surgery was scheduled and that she would need leave. (Dkt. 102-1 at 308–309 (Robinson-Cooper Dep. at 307:18–308:1).) Giving notice of the need for FMLA leave is protected activity. She was eligible for leave, and her surgery qualified. See Part VII. Defendant then terminated her. The first two elements are satisfied.

**b. A reasonable jury could find that her request for leave caused her termination.**

A plaintiff can prove causation by showing (1) that the employer's reasons are pretextual, (2) suspicious timing between the protected activity and the adverse action, or (3) "other bits and pieces from which an inference of discriminatory or retaliatory intent might be drawn." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012). Dr. Robinson-Cooper has evidence of all three.

**i. There is Suspicious Timing Between the Dr. Robinson-Cooper informing Ellspermann of her Surgery and her LCA and termination.**

First there is suspicious timing between the protected activity and the adverse action supports an inference of causation. When the adverse action comes "on the heels" of the protected activity, the timing supports an inference of retaliation. *See Dey*, 28 F.3d at 1458. A one-day gap between a complaint and a termination is enough. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). "A close temporal connection between the two events 'is generally enough to satisfy the third element of the prima facie test.'" *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)).

The adverse actions here came on the heels of Dr. Robinson-Cooper's protected activity. In January 2024, she told Ellspermann that her surgery was scheduled and that she would need leave. (Dkt. 102-1 at 309 (Robinson-Cooper Dep. at 308:17–24).) Within weeks, Ivy Tech issued the last chance agreement. *See* Part II.g. Three weeks after that, and two days before her surgery, Ivy Tech fired her. (Dkt. 102-1 at 293 (Robinson-Cooper Dep. at 292:1–11).) Ivy Tech escalated from coaching to a last chance agreement and then to termination only after she gave notice. That timing is enough for a jury to infer that her request for leave caused her termination.

**ii. Other bits and pieces.**

Ellspermann told Dr. Robinson-Cooper that she did not need FMLA leave for knee surgery. (Dkt. 102-1 at 309 (Robinson-Cooper Dep. at 308:17–24).) Defendant admits that Ellspermann steered her toward remote work "to ensure she could continue in her role." (Dkt. 102-8 at 4.) Those statements show that the decisionmaker viewed the leave as unnecessary and unwelcome. Ivy Tech then ended Dr. Robinson-Cooper's health insurance at midnight on the day it fired her, just before the surgery. (Dkt. 102-20 at 5 (Robinson-Cooper Aff. ¶ 39).) Together with the comparator evidence that Ellspermann excused far worse conduct by white men, *see* Part VI.c, these facts allow a jury to infer that the leave, not the complaints, drove the decision. Summary judgment on the FMLA retaliation claim should be denied.

## CONCLUSION

The record presents genuine disputes on every contested element of Dr. Robinson-Cooper's claims: whether Defendant applied its expectations and disciplinary rules to her as it applied them to white male leaders; whether Defendant's stated reasons for her termination are its true reasons; whether Ellspermann acted with discriminatory intent; whether Dr. Robinson-Cooper gave notice of her need for leave and whether Ellspermann discouraged her from taking

it; and whether her request for leave caused her termination. Each turns on the credibility of witnesses, the weight of the evidence, and the inferences to be drawn from it, which are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Defendants' Motion for Summary Judgment must therefore be denied.

Respectfully submitted,

*s/ Amber K. Boyd*
Amber K. Boyd, #31235-49
AMBER BOYD LAW
8506 Evergreen Avenue
Indianapolis, IN 46240
(317) 960-5070
amber@amberboydlaw.com
Counsel for Plaintiff